UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**STEVEN TRABAYKO MEILLER, et al.,**

     **Plaintiffs,**

     **v.**                            **Case No:  8:09-CV-1847-T-33AEP**

**PASCO COUNTY, FLORIDA, BOARD OF
COUNTY COMMISSIONERS, et al.,**

     **Defendants.**

_____/

## REPORT AND RECOMMENDATION

THIS MATTER comes before the Court on the following motions:

     1) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Lt. Thomas Perron** (Dkt. No. 35);

     2) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Sgt. Donald Kandalec** (Dkt. No. 36);

     3) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Sgt. James Rollston** (Dkt. No. 37);

     4) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Deputy Michael Senter** (Dkt. No. 38);

     5) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Deputy Ronald Davis** (Dkt. No. 39);

6) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Deputy Shawn Rozankowski** (Dkt. No. 40);

7) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Deputy Pedro Ojeda** (Dkt. No. 41);

8) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Cindy Bell, LPN** (Dkt. No. 42);

9) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Elizabeth Kenjorski, LPN** (Dkt. No. 43);

10) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant M.H. Perez, LPN** (Dkt. No. 44);

11) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Julie Merritt, LPN** (Dkt. No. 45);

12) **Motion to Dismiss by Defendant Pasco Sheriff White** (Dkt. No. 46); and

13) **Defendant's Pasco County, Motion to Dismiss Count I, IV and V of Plaintiff's First Amended Complaint** (Dkt. No. 47).[1]

Plaintiff filed a consolidated Response in opposition to the Motions (Dkt. No. 69).  The Court has carefully reviewed the Motions and the consolidated Response and is otherwise fully advised in the premises.  For the reasons stated below the Court recommends that the Motions to Dismiss of Defendants Sgt. Donald Kandalec, Deputy Michael Senter, Deputy Ronald Davis,

---

[1] On September 7, 2010, Defendant Terry Cruse-Frawley, LPN, filed an unopposed Motion to Respond to Plaintiff's First Amended Complaint Out of Time (Dkt. No. 79).  The Court will address that motion by a separate order.

Deputy Shawn Rozankowski, Cindy Bell, LPN, Elizabeth Kenjorski, LPN, Defendant M.H. Perez, LPN, Pasco County Sheriff White, and Pasco County be **GRANTED IN PART** and **DENIED IN PART** as set forth herein, and that the Motions to Dismiss of Defendants Lt. Thomas Perron, Sgt. James Rollston, Deputy Pedro Ojeda, and Julie Meritt, LPN, be **GRANTED**.[2]

### Factual Background

This case arises from the tragic death of Thomas James Fredenburg, allegedly caused by opiate withdrawal while he was incarcerated as a pre-trial detainee at the Pasco County Jail ("Jail"). Plaintiff, Steven Trabayko Meiller, Esq., as personal representative of Mr. Fredenburg's Estate, filed suit on behalf of the Estate and the Estate's survivors alleging civil rights violations under 42 U.S.C. § 1983, as well as wrongful death and negligence under Florida's Wrongful Death Act (Fla. Stat. § 768.16 *et seq*. (2008)). The named defendants are Pasco County, Pasco County Sheriff Bob White, Health Services Director Dalia Hernandez Gibson, nine Pasco County Sheriff's Office jail officers, and eight Pasco County Sheriff's Office nurses. Plaintiff seeks damages for injuries caused by Mr. Fredenburg's death, and damages for Mr. Fredenburg's injuries he suffered prior to his death as well as his loss of life, or hedonic damages.

---

[2] The Motions (Dkt. Nos. 35-47) were referred to the undersigned for a Report and Recommendation by the Honorable Virginia M. Hernandez Covington (Dkt. No. 77).

Plaintiff alleges[3] that on August 24, 2007, Mr. Fredenburg was booked into the Jail and, during a screening, admitted to ongoing drug use of Soma, Valium, and Oxycodon. (Dkt. No. 30 ¶ 44.) According to Plaintiff, the following day, he submitted a medical request form "stating restless, opiate withdrawals, and no sleep." (*Id.* ¶ 45.) On August 26, 2007, Mr. Fredenburg was allegedly evaluated by Defendant Terry Cruse-Frawley, LPN, ("Frawley") and admitted to using heroin, Valium, Xanax, Oxycodon, and Oxycontin. (*Id.* ¶¶ 21, 46.) Defendant Frawley allegedly documented observing tremors and dry skin and noted the initiation of daily observations in checking vital signs. (*Id.* ¶ 46.) Plaintiff alleges that no reported notes or incidents were documented on August 27, 28, and 29, 2007, by the Sheriff's detention and nursing personnel. (*Id.* ¶¶ 47-49.) On August 30, 2007, Defendant Deputy J. Green ("Green") allegedly observed Mr. Fredenburg rocking back and forth in the cell and notified Defendant Cindy Bell, an LPN ("Bell"). (*Id.* ¶¶ 18, 50.) According to Plaintiff, Defendant Bell approved Mr. Fredenburg to be moved to a medical cell, which was a single person cell with concrete walls and no padding. (*Id.* ¶ 50.) Plaintiff further alleges that between August 24, 2007, and August 30, 2007, Mr. Fredenburg received no medication or medical treatment and that "the detention deputies and nurses completely ignored his presence and medical needs." (*Id.*)

Plaintiff alleges that on August 30, 2007, Wayman Boggs, a mental health worker supervised by Defendant Dalia Hernandez Gibson ("Gibson), the Health Services Director of the

---

[3] Plaintiff asserts that these allegations are based on the Sheriff's detention records "documented by the named defendant detention deputies, their supervisors, and/or nurses." (Dkt. No. 30 ¶¶ 42-43.)

Detention Facility,[4] interviewed Mr. Fredenburg and "observed him to be 'somewhat paranoid: S&S of a perceptual disorder, anxiety and insomnia - may yet be W/D from Benzos and opiates.'" (*Id*. ¶ 51.)  On the same day, Defendant Elizabeth Kenjorski, LPN ("Kenjorski") after allegedly observing Mr. Fredenburg yelling at his cell door, very agitated and appearing to have dilated pupils, noted "per S/O start D.T. protocol (with Librium)." (*Id*. ¶ 52.)  Plaintiff alleges that Mr. Fredenburg was never prescribed the Librium.  (*Id*.)  Further, Plaintiff alleges that on the same day, Mr. Fredenburg was handcuffed and escorted by three deputies to the ISRC (non-padded cell), after Defendant Deputy T. Woods ("Woods") observed him yelling and kicking at the cell door and appearing delusional.  (*Id*. ¶ 53.)  Defendant Woods allegedly notified Defendant Carolyn Nowak, R.N. ("Nowak"), who reported that Mr. Fredenburg was placed on property authorization and on finger foods, and who placed a call to Dr. Ayman Hanna.  (*Id*. ¶ 54.)  Plaintiff alleges that on August 30, 2007, at 8:10 P.M., a fifteen (15) minute watch was initiated on Mr. Fredenburg which continued for the remainder of his time at the Jail.  (*Id*. ¶ 55.)  At 8:15 P.M., Dr. Hanna allegedly returned Defendant Nowak's call, approving the initiation of the property authorization and the IRSC housing.  (*Id*. ¶ 56.)  On August 30, 2007, at 9:00 P.M., Mr. Fredenburg allegedly received his first medications administered by the Jail personnel.  (*Id*. ¶ 57.)

Plaintiff asserts that on August 31, 2007, probably in the morning, Mr. Boggs observed Mr. Fredenburg in the IRSC cell exhibiting perceptual disorder and depression, and recommended keeping Mr. Fredenburg on property authorization, finger food, and in the padded cell for another

---

[4] Plaintiff alleges that Mr. Boggs was employed by Dr. Ayman Hanna, a private healthcare provider working for the Jail pursuant to a contract.  (Dkt. No. 30 ¶ 51.)

twenty-four hours.  (*Id.* ¶ 59.)  The following day, according to Plaintiff, Mr. Boggs observed Mr. Fredenburg in the medical cell appearing to have a psychotic episode.  (*Id.* ¶ 61.)  Plaintiff further alleges that on September 2, 2007, Mental Health Worker Alyssa Smith, also employed by Dr. Hanna, observed Mr. Fredenburg pacing his cell without clothing and acting in a bizarre manner. (*Id.* ¶ 62.)

Plaintiff alleges that on September 5, 2007, Mr. Fredenburg refused to have his vital signs taken, but that because Mr. Fredenburg was acting in a bizarre manner he "would not have been in any mental state to properly understand and evaluate having his vital signs taken, nor refusing services and meals."  (*Id.* ¶¶ 67-68.)  Plaintiff alleges that on September 6, 2007, at 7:10 A.M., Mr. Fredenburg was transported to court, returned to his cell at 11:30 A.M., and that at 3:15 P.M. his vital signs were recorded for the last time until he was transported by EMS.  (*Id.* ¶¶ 69-70.) At 5:00 P.M., he allegedly refused his hour out of the cell for exercise, and at 9:00 P.M., he allegedly refused all medications.  (*Id.* ¶ 71-72.)

While no incidents were reported on September 7, 2007, Plaintiff alleges that on September 8, 2007, at 2:00 A.M., Deputy Halstead heard a thump and whimper coming from Mr. Fredenburg's medical cell, a single person cell with concrete walls and no padding.  (*Id.* ¶¶ 73-74.)  Upon observing Mr. Fredenburg lying on his side and crying, Deputy Halstead allegedly called Defendant M.H. Perez, LPN ("Perez"), who twice told Deputy Halstead that Mr. Fredenburg did not meet the criteria to be moved to a soft room or the restraint chair.  (*Id.* ¶ 74.) At 2:25 A.M., Defendant Perez allegedly responded to Deputy Halstead's request for assistance and observed Mr. Fredenburg rolling on the ground and hitting the floor.  (*Id.* ¶ 75.)  Plaintiff

claims that upon examining Mr. Fredenburg, who was uncooperative, Defendant Perez observed a large bruise on his left hip. (*Id*.) Between 2:00 A.M. and 5:50 A.M., Plaintiff alleges that inmate Don Morgan from the cell adjacent, heard Mr. Fredenburg run into the wall several times and heard the Deputy calling for a nurse. (*Id*. ¶ 76.) Inmate Morgan allegedly reported that it took the nurse approximately thirty (30) minutes to arrive and that "she did not really seem to care about what happened" to Mr. Fredenburg. (*Id*.) Around 5:50 A.M. both Defendant Deputy Michael Senter ("Senter") and Defendant Deputy Ronald Davis ("Davis") allegedly observed Mr. Fredenburg running into the cell wall and falling on the floor, both noticing bruises over his body. (*Id*. ¶¶ 77-78.) Plaintiff alleges that Defendant Senter and two other deputies escorted Mr. Fredenburg to the IRSC (padded cell). (*Id*. ¶ 77.) At around 9:30 A.M., Plaintiff claims that upon observing Mr. Fredenburg "to be disoriented, confused, with unintelligible sounds, disconnected thoughts and catatonic behavior," Mr. Boggs called Dr. Hanna. (*Id*. ¶ 79.) Dr. Hanna allegedly called Defendant Julie Merritt, LPN ("Merritt") around 9:30 A.M., approving Mr. Fredenburg's placement in the IRSC and ordering additional medications for him. (*Id*.)

Between 5:55 A.M. and 12:45 P.M., Defendant Davis allegedly stated that Mr. Fredenburg "was doing O.K. for a few minutes" after being placed in the IRSC, and that while he "was still running into the wall . . . they were not concerned about him because the walls were somewhat padded." (*Id*. ¶ 81.) Plaintiff alleges that Defendant Davis grew concerned when Mr. Fredenburg started to throw himself on the floor near the steel drain area, and spoke with Defendant Sgt. Donald Kandalec ("Kandalec"), who advised Defendant Davis to place Mr. Fredenburg in the prostraint chair. (*Id*.) At this point, Plaintiff asserts, Mr. Fredenburg was placed in a prostraint

chair even though he "was delusional, exhibiting psychotic episodes" with trauma to the head and body. (*Id.* ¶ 82.) Plaintiff argues that Mr. Fredenburg's placement in the prostraint chair was a punitive action that violated his Constitutional rights. (*Id.*) Additionally, Plaintiff alleges that the Board of County Commissioners and the Sheriff's Office, including Defendant Sheriff and all Defendant detention deputies and nurses were aware of similar events,[5] demonstrating "their conscience [*sic*] indifference/deliberate indifference to the established Constitutional rights" of Mr. Fredenburg. (*Id.* ¶ 83.)

On September 8, 2007, at 12:45 P.M., upon observing Mr. Fredenburg throw himself onto the cell floor and repeatedly landing near the steel grate, Defendant Senter allegedly informed Defendant Kandalec who advised Defendant Senter to place Mr. Fredenburg in the prostraint chair. (*Id.* ¶ 84.) Before being taken to the prostraint chair, Defendant Davis allegedly stated that Defendant Senter and Defendant Deputy Shawn Rozankowski ("Rozankowski") "waited until **Thomas James Fredenburg** <u>ran into the wall and fell on the floor before they took him into custody</u>." (*Id.* ¶ 85.) According to Plaintiff, "[t]he actions of **DAVIS, SENTER and ROZANKOWSKI** clearly indicate they were deliberately indifferent to the rights of **Thomas James Fredenburg** in that he not be physically abused as a result of his arrest and incarcerated as a <u>pre-trial inmate</u>." (*Id.* ¶ 86.)

On September 8, 2007, at 5:15 P.M., Defendant Senter allegedly observed Mr. Boggs check on Mr. Fredenburg in the prostraint chair and stated that Mr. Fredenburg was making

---

[5] Plaintiff specifically refers to a case with similar facts in which, according to Plaintiff, "defendants . . . acted in a manner frightfully similar to the facts taken from Thomas James Fredenburg's detention file." (Dkt. No. 30 ¶ 35.)

irrational statements and that Mr. Boggs decided to leave him in the prostraint chair.  (*Id*. ¶ 87.)

According to Plaintiff, at 5:52 P.M., Defendant Deputy Pedro Ojeda ("Ojeda") relieved Defendant

Senter in the medical wing and removed Mr. Fredenburg from the prostraint chair, escorting him

back to the IRSC.  (*Id*. ¶ 88.)  At 8:00 P.M., RN Erickson, of the Sheriff's Office, allegedly

observed Mr. Fredenburg on a video monitor sitting on the cell floor near the door with his head

slightly tilted, and proceeded with Nurse Bromwell to evaluate Mr. Fredenburg.  (*Id*. ¶ 90.)

Plaintiff claims that when Mr. Fredenburg was found to be breathing but completely

unresponsive, RN Erickson instructed Defendant Sgt. Donald Rollston ("Rollston") to activate

an EMS response.  (*Id*.)  At 8:30 P.M., Mr. Fredenburg was allegedly transported to Tampa

General Hospital where he was placed in a drug induced coma and on full life support.  (*Id*. ¶¶

91-92.)

Plaintiff alleges that on September 10, 2007, at 11:25 A.M., LPN Gibson was informed

by Sgt. Berry of the Sheriff's Office that Mr. Fredenburg was placed on ROR from the custody

of the Jail.  According to Plaintiff, "[t]he term ROR refers to a pre-trial inmate being released on

his own recognizance" and "carries with it the legal connotation the pre-trial inmate be allowed

to leave the jail and voluntarily return for future court dates."  (*Id*. ¶ 95.)  Plaintiff alleges that

"[i]ronically, a Pasco County Circuit Judge signs an order wherein **Thomas James Fredenburg**

*will not be prosecuted* and he, in fact, can come and go as he pleases but is no longer a pre-trial

inmate as he has been released on his own recognizance's [*sic*]."  (*Id*. ¶ 97.)  According to

Plaintiff,  "these events orchestrated by the Pasco County **SHERIFF**'s Office and the Pasco

County Board of County Commissioners (**COUNTY**) were put in motion for the sole purpose of

9

not being responsible for any medical bills **Thomas James Fredenburg** would incur as he was no longer an inmate at the Pasco County Jail." (*Id.* ¶ 98.)

Plaintiff claims that on September 10, 2007, at 4:35 P.M., LPN Gibson of the Sheriff's Office was informed by Sgt. Gibson of the Sheriff's Office that Mr. Fredenburg had passed away. (*Id.* ¶ 99.)  According to Plaintiff, the Hillsborough County Medical Examiner Autopsy report reflects that the Medical Examiner and his expert were suspicious of the facts surrounding Mr. Fredenburg's appearance and nature of his bruises. (*Id.* ¶ 100.)  Upon traveling to the Jail, they allegedly learned that no investigation had been initiated and that the entire area had been cleaned "and was not considered to be a crime scene." (*Id.* ¶ 102.)

Plaintiff alleges that during Mr. Fredenburg's incarceration, "the **SHERIFF** and the named **Defendant** employees, to include the **SHERIFF**'s[] nurses had control over his person and those defendants were the final authority as to whether or not **Thomas James Fredenburg** could be transferred to an appropriate health care facility for treatment." (*Id.* ¶ 103.)  Plaintiff alleges that the Sheriff and Defendant detention deputies and nurses "were deliberately indifferent and/or negligent in that they did not order **Thomas James Fredenburg** to be transported by ambulance to a health care facility." (*Id.*)  According to Plaintiff, as a result of Defendants' actions, Mr. Fredenburg sustained injuries to his head and torso, which proved fatal. (*Id.*)

### Applicable Legal Standards

Rule 8 of the Federal Rules of Civil Procedure specifies that a complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  If the complaint fails to state a claim upon which relief may be granted, a motion to

dismiss may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  In deciding a

motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in a

complaint as true and take them in the light most favorable to the plaintiff.  *See United Techs.*

*Corp. v. Mazer*, 556 F.3d 1260, 1269 (11th Cir. 2009).  "While a complaint attacked by a Rule

12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation

to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to relief

above the speculative level on the assumption that all of the complaint's allegations are true."

*Id.*  Plaintiff must plead enough facts to state a plausible basis for the claim.  *Id.*; *see also James*

*River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008) ("To survive

dismissal, 'the complaint's allegations must plausibly suggest that the plaintiff has a right to

relief, raising that possibility above a speculative level; if they do not, the plaintiff's complaint

should be dismissed.'") (*quoting Twombly*, 550 U.S. at 555-56).  Additionally, "[t]he tenet that

a court must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

With respect to § 1983 cases that involve individuals entitled to assert qualified immunity,

the Eleventh Circuit imposes "heightened pleading requirements."  *Swann v. S. Health Partners,*

*Inc.*, 388 F.3d 834, 836-38 (11th Cir. 2004) (*citing Leatherman v. Tarrant County*, 507 U.S. 163

(1993)); *Laurie v. Ala. Court of Crim. Appeals*, 256 F.3d 1266, 1275-76 (11th Cir. 2001).  This

heightened pleading standard requires a plaintiff to allege the facts supporting a § 1983 claim with some specificity.  *See GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1368 (11th Cir. 1998) (stressing "that the heightened pleading requirement is the law of this [C]ircuit").

## Analysis

1. **Motions to Dismiss of Defendants Perron, Kandalec, Rollston, Senter, Davis, Rozankowski, Ojeda, Bell, Kenjorski, Perez, Meritt, and Sheriff White**

Defendants Perron, Kandalec, Rollston, Senter, Davis, Rozankowski, Ojeda, Bell, Kenjorski, Perez, and Meritt have each moved to dismiss Count III of the Amended Complaint, the only count asserted against them.  (Dkt. Nos. 35-45.)  Count III alleges that these Defendants and other detention officers and jail nurses,

> while acting under color of State law and by virtue of the authority vested in them by the State or its agencies, violated **Thomas James Fredenburg's** Constitutional rights: by using excessive and reasonable force; by striking and beating **Thomas James Fredenburg** while he was restrained; by restraining **Thomas James Fredenburg** in a manner such that he suffered from a violent withdrawal from opium based products which were causing **Thomas James Fredenburg** to behave irrationally, by using unlawful cruel and unusual punishment; by failure to appropriately supervise the defendants over whom they had supervisory authority; and by either conducting themselves pursuant to unlawful policies or procedures or by deliberately ignoring and failing to comply with established policies and procedures concerning the use of force in control of such inmates, such that said **Defendants** caused **Thomas James Fredenburg**'s death and/or physical pain and suffering.

(Dkt. No. 30 ¶ 120.)

These Defendants make two primary arguments in support of their Motions to Dismiss.  First, Defendants argue that they are entitled to qualified immunity.  Second, Defendants contend that the damages claimed for Mr. Fredenburg's physical and mental pain and suffering and the loss of enjoyment of life are not recognized under Florida law and should be dismissed.

12

Defendant R.L. White, in his official capacity as Sheriff of Pasco County also moves to dismiss the damages claims in Counts III, VI, and VII for the physical and mental pain and suffering and loss of enjoyment of life of Mr. Fredenburg on the basis that these types of damages are not authorized by the Florida Wrongful Death Act.  (Dkt. No. 46.)

### A.    Qualified Immunity

Title 42 U.S.C. § 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws."  To establish a claim under § 1983, a plaintiff must prove that (1) defendant deprived her of a right secured under the Constitution or federal law, and (2) such deprivation occurred under color of state law.  *Arrington v. Cobb County*, 139 F.3d 865, 872 (11th Cir. 1998); *U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1288 (11th Cir. 2001).

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts utilize a two-part framework to evaluate qualified immunity claims.  The first inquiry is "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  If the facts, accepted as true and taking them in the light most favorable to the plaintiff, show that a constitutional right has been violated, the next inquiry is whether the right violated was "clearly established." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010) (*citing Saucier*, 533 U.S. at 201)).

13

"Both elements of this test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case." *Brown*, 608 F.3d at 734 .

In this case, it appears to be undisputed that Defendants Perron, Kandalec, Rollston, Senter, Davis, Rozankowski, Ojeda, Bell, Kenjorski, Perez, and Meritt were performing job-related functions and acting within the scope of their discretionary authority. *See Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (to determine whether the acts in question involved the exercise of actual discretion, a court looks at "whether the government employee was (a) performing a legitimate job-related function . . . (b) through means that were within his power to utilize."). Thus, they are entitled to qualified immunity unless they violated Mr. Fredenburg's clearly established constitutional rights. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005).[6]

Plaintiff argues that Defendants Perron, Kandalec, Rollston, Senter, Davis, Rozankowski, Ojeda, Bell, Kenjorski, Perez, and Meritt "were deliberately indifferent to the serious medical condition of Mr. Fredenburg, a pre-trial detainee, in violation of the Fourteenth Amendment."[7] "To prevail on a deliberate indifference to serious medical need claim, [a plaintiff] must show:

---

[6] At the time of Mr. Fredenburg's incarceration, it was clearly established that knowledge of the need for medical care and refusal to provide that care constitutes deliberate indifference. *See Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994).

[7] As a pre-trial detainee, Mr. Fredenburg's rights exist under the due process clause of the Fourteenth Amendment, rather than the Eighth Amendment. *Mann v. Taser Int'l, Inc.*, 688 F.3d 1291, 1306 (11th Cir. 2009) (citation omitted). "Nonetheless, [Plaintiff's] claims are subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment." *Id*. (citation omitted).

14

(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l Inc.*, 588 F.3d at 1306-07 (11th Cir. 2009) (*citing Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007)).

*(1) Serious Medical Need*

The deliberate-indifference standard has two components, "an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind." *Sims v. Mashburn*, 25 F.3d 980, 983 (11th Cir. 1994). To meet the objective component in a denial or delay of treatment case, a plaintiff must first demonstrate the existence of an "objectively serious medical need." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to [a] violation only if those needs are 'serious.'" *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994)(*quoting Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).

"A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Mann,* 588 F.3d at 1307 (*quoting Hill*, 40 F.3d at 1187), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Alternatively, a serious medical need may be determined by whether a delay in treatment worsens the condition. *Mann*, 588 F.3d at 1307 (*citing Hill*, 40 F.3d at 1188-89). "In either case, 'the medical need must be one that, if left

unattended, poses a substantial risk of serious harm.'" *Id.* (*quoting Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).

Here, Plaintiff contends that Mr. Fredenburg's narcotic withdrawal was a serious medical need. Courts have previously determined that serious drug and alcohol addiction can constitute an objective serious medical need. *See, e.g.*, *Davis v. Carter*, 452 F.3d 686, 688, 695 (7th Cir. 2006) (holding that a drug and alcohol addiction requiring methadone maintenance program was a serious medical need); *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425-26 (11th Cir. 1997) (stating that acute alcohol withdrawal that causes seizures to be a serious medical condition); *Morrison v. Washington County, Ala.*, 700 F.2d 678, 686 (11th Cir. 1983) (holding that a person suffering from acute alcohol-abstinence syndrome is seriously ill). Indeed, drug and alcohol addictions that have been found to constitute an objectively serious medical need are those that result or have the potential to result in a serious injury. *See, e.g*, *Davis*, 452 F.3d at 688 (death); *Lancaster*, 116 F.3d at 1425-26 (seizures and death); *Morrison*, 700 F.2d at 686-87 (death). Here, according to Plaintiff's allegations, Mr. Fredenburg's drug withdrawals tragically resulted in his death. Thus, the Court is satisfied that the Plaintiff has sufficiently alleged that Mr. Fredenburg had an objectively serious medical need. The next issue is whether Defendants were deliberately indifferent to Mr. Fredenburg's serious medical need in violation of the Eight Amendment's prohibition of cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

16

*(2) Deliberate Indifference to a Serious Medical Need*

"The Supreme Court has cautioned that not every allegation of inadequate medical treatment states a constitutional violation." *Mann*, 588 F.3d at 1307 (*citing Estelle*, 429 U.S. at 105).

> [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. . . . In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment.

*Estelle*, 429 U.S. at 105-06. In the Eleventh Circuit, to show a deliberate indifference to a serious medical need, a plaintiff must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (*citing McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).

As to the first prong, "[w]hether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Goebert*, 510 F.3d at 1327 (*quoting Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). As to the second prong, "[d]isregard

of the risk is also a question of fact that can be shown by standard methods." *Id*. Finally, as to

the third prong, the Eleventh Circuit has stated that:

> [t]he meaning of 'more than gross negligence' is not self-evident but past decisions have developed the concept. In cases that turn on the delay in providing medical care, rather than the type of medical care provided, we have set out some factors to guide our analysis. Where the prisoner has suffered increased physical injury due to the delay, we have consistently considered: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay.

*Id*. (*quoting Hill*, 40 F.3d at 1189).

When a prison official eventually provides medical care, the prison official's act of

delaying the medical care for a serious medical need may constitute an act of deliberate

indifference. *See McElligott*, 182 F.3d at 1255; *Harris v. Coweta County*, 21 F.3d 388, 393-94

(11th Cir. 1994); *Brown v. Hughes*, 894 F.2d 1533, 1537-39 (11th Cir. 1990). In determining

whether the length of the delay is unconstitutional, courts consider the nature of the medical need

and the reason for the delay. *McElligott*, 182 F.3d at 1255. A court should also consider whether

the delay in providing treatment worsened the plaintiff's medical condition, and as such "[a]n

inmate who complains that delay in medical treatment [rises] to a constitutional violation must

place verifying medical evidence in the record to establish the detrimental effect of the delay."

*Hill*, 40 F.3d at 1187, *abrogated on other grounds by Hope v. Pelzar*, 536 U.S. 730 (2002).

Thus, the Court must determine whether Plaintiff has sufficiently alleged that each of the

individual Defendants seeking dismissal of Count III were deliberately indifferent to Mr.

Fredenburg's serious medical need. However, before reaching that step, the Court notes that

Plaintiff's claims are based upon mixed theories of liability, to include whether the Defendants were liable for their individual participation or for their participation in a supervisory capacity.

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal citations and quotations omitted). Indeed, "[t]he standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Mann*, 588 F.3d at 1308 (*quoting Braddy v. Florida Dept. of Labor and Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998)). "Supervisors can be held personally liable when either (1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation." *Id.* (*citing Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988)). The causal connection is established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Cottone*, 326 F.3d at 1360. "Alternatively, the causal connection may be established when a supervisor's custom or policy . . . results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (internal citations and quotations omitted).

Thus, here, the Court will analyze whether Defendants acted with deliberate indifference based either on their own personal participation or their actions as a supervisor. *See Duff v. Steub*, No. 09-11462, 2010 WL 1718704, at *3 (11th Cir. Apr. 29, 2010) ("Deliberate indifference can

19

be based on the defendant's personal participation in the allegedly unconstitutional conduct or on the defendant's actions as a supervisor.'").

### 1)       Defendant Lt. Thomas Perron

As alleged in Plaintiff's Amended Complaint, Defendant Lt. Thomas Perron "was, at all times pertinent hereto, a Deputy, Corrections Officer, or Detention Personnel employed by defendant **COUNTY** or defendant **SHERIFF**, or taking direction therefrom." (Dkt. No. 30 ¶ 10.) In his Motion to Dismiss, Defendant Perron asserts that Plaintiff "does not set forth any factual allegations that Lt. Perron personally had knowledge of and was deliberately indifferent to Fredenburg's serious medical needs." (Dkt. No. 35 at 9.)  Additionally, to the extent that the claim is based on a theory of supervisory liability, Defendant Perron argues that the claim fails because Plaintiffs have not alleged either a) a history of widespread abuse that put Defendant Perron on notice of the need to correct the alleged deprivation and that he failed to do so; b) that Defendant Perron had a specific custom or policy that resulted in a deliberate indifference to Mr. Fredenburg's constitutional rights; or c) facts to support an inference that Defendant Perron directed his subordinates to act unlawfully or that he knew that his subordinates would act unlawfully and that he failed to stop them.  (Dkt. No. 35 ¶ 7.)

The Court agrees with Defendant Perron.  The Amended Complaint simply contains no factual allegations connecting Defendant Perron to any violations of Mr. Fredenburg's constitutional rights.  (*See* Dkt. No. 30.)  Indeed, Plaintiff fails to allege that Defendant Perron personally participated in the alleged constitutional violation or establish a causal connection between Defendant Perron and the alleged constitutional violation.  Thus, because the Amended

Complaint contains no allegations against Defendant Perron, it is recommended that Defendant

Perron's Motion to Dismiss (Dkt. No. 35) be **GRANTED**.

### 2)      Defendant Sgt. Donald Kandalec

In Plaintiff's Amended Complaint, Defendant Sgt. Donald Kandalec is alleged to have

been "at all times pertinent hereto, a Deputy, Corrections Officer, or Detention Personnel

employed by defendant **COUNTY** or defendant **SHERIFF**, or taking direction therefrom." (Dkt.

No. 30 ¶ 11.)  Plaintiff's allegations against Defendant Kandalec are as follows:

> 81.  On September 8, 2007, at approximately between 0555 and 1245, **DAVIS**, employed by the **SHERIFF**, stated that after **Thomas James Fredenburg** was placed in the IRSC he was doing O.K. for a few minutes.  **DAVIS** stated **Thomas James Fredenburg** was still running into the wall, however they were not concerned about him because the walls were somewhat padded.  **DAVIS** grew concerned when **Thomas James Fredenburg** started to throw himself on the floor near the steel drain area.  At approximately noon **DAVIS** spoke to **KANDALEC**, a Supervisor of the detention department.  **KANDALEC** advised **DAVIS** to place **Thomas James Fredenburg** in the **prostraint chair**, as documented in Det. Proctor's report dated 10-4-07, Page 2, Line 12.

> 82.  At this point, **Thomas James Fredenburg** was delusional, exhibiting psychotic episodes, with catatonic-like behavior, as well as being disoriented and having trauma to the head and body was placed in a non-medical device called a **prostraint chair**.  A **prostraint chair** is used to dissuade aggressive inmates from fighting either deputies or other inmates.  There is no medical reason, *given* **Thomas James Fredenburg's** *physical condition and state of mind*, for placing **Thomas James Fredenburg** in a **prostraint chair.  This was a punitive action and it violated his Constitutional rights**.  To this point, no one from the **COUNTY**, no one from the **SHERIFF**'s office, no one from the **SHERIFF**'s detention department, and no one from the **SHERIFF**'s nursing department had any intention of providing **Thomas James Fredenburg** with proper medical care.  **Thomas James Fredenburg** should have been placed in care of a mental health institution or hospital with proper facilities to deal with his problem.

> 84.   On September 8, 2007 at 1245, **SENTER**, of the **SHERIFF**'s office, observed **Thomas James Fredenburg** throw himself head first onto the cell floor repeatedly landing near the steel grate.   **SENTER** informed **KANDALEC**, who advised **SENTER** to place Thomas James **Fredenburg** in the **prostraint chair "again"**!   **SENTER** and two other unknown deputies escorted **Thomas James Fredenburg** to be placed in the **prostraint chair**.   Mental Health Worker Boggs and **SCHMIDT** were also notified, as documented in the Pasco County Jail Incident Report dated 9-8-07 at 1315.

(Dkt. No. 30 ¶¶ 81-82, 84.)  Defendant Kandalec argues that "[t]hese limited actions . . . cannot be construed as so grossly incompetent to shock the conscience, which is the required showing to hold him liable individually." (Dkt. No. 36 at 9.)  However, the Court finds that Plaintiff has adequately alleged that Defendant Kandalec was deliberately indifferent to Mr. Fredenburg's serious medical needs.

As to the first prong of the "deliberate indifference" analysis, Plaintiff's Amended Complaint, when viewed in light more favorable to Plaintiff, indicates that Defendant Kandalec was informed that Mr. Fredenburg was throwing himself on the floor near the steel drain area. Thus, subjective knowledge may be inferred "from the very fact that the risk was obvious." *Goebert*, 510 F.3d at 1327.  The facts next establish that Defendant Kandalec advised placing Mr. Fredenburg in a prostraint chair.  According to Plaintiff, the prostraint chair was not adequate given Mr. Fredenburg's physical condition.  Thus, Plaintiff's Amended Complaint, taken in light most favorable to Plaintiff, indicates that Defendant Kandalec may have disregarded that risk. *See Goebert*, 510 F.3d at 1327 ("Disregard of the risk . . . is a question of fact.").  Finally, Plaintiff has adequately alleged that Defendant Kandalec's conduct may have also been more than merely negligent because he ordered that Mr. Fredenburg be placed in a prostraint chair for a second time, even though the initial restraint did not curtail Mr. Fredenburg's behavior.

22

Thus, the Court concludes that Plaintiff's Amended Complaint adequately alleges that Defendant Kandalec had subjective knowledge of a risk of serious harm, that he disregarded that risk, and that his conduct constituted more than mere negligence.  Moreover, the Amended Complaint sufficiently alleges that these actions caused injury to Mr. Fredenburg.  Accordingly, it is recommended that Defendant Kandalec's Motion to Dismiss (Dkt. No. 36) be **DENIED**.

### 3)  Defendant Sgt. James Rollston

Defendant Sgt. James Rollston is alleged to have been "at all times pertinent hereto, a Deputy, Corrections Officer, or Detention Personnel employed by defendant **COUNTY** or defendant **SHERIFF**, or taking direction therefrom."  (Dkt. No. 30 ¶ 13.)  The only factual allegation in the Amended Complaint against Defendant Rollston states that "RN Erickson instructed **ROLLSTON** to activate an EMS response, as documented in nursing notes, Page 8, Line 25."  (Dkt. No. 30 ¶ 90.)  Defendant Rollston contends that this allegation "[is] insufficient to state a § 1983 claim against Sgt. Rollston."  (Dkt. No. 37 at 9.)  The Court agrees that Plaintiff's allegations against Defendant Rollston fail to establish a constitutional violation.  The facts as alleged against Defendant Rollston (that RN Erickson instructed Defendant Rollston to activate an EMS) are clearly insufficient to plausibly establish that Defendant Rollston had knowledge of a risk of serious harm and disregarded that risk.  Additionally, Plaintiff fails to allege that there is any causal connection between Defendant Rollston's actions and any constitutional violation to establish supervisory liability.  Accordingly, the Court recommends that Defendant Rollston's Motion to Dismiss (Dkt. No. 37) be **GRANTED**.

### 4)      Defendant Deputy Michael Senter

As alleged in Plaintiff's Amended Complaint, Defendant Deputy Michael Senter "was, at all times pertinent hereto, a Deputy, Corrections Officer, or Detention Personnel employed by defendant **COUNTY** or defendant **SHERIFF** or taking direction therefrom." (Dkt. No. 30 ¶ 14.) The allegations against Defendant Senter are contained in the paragraphs set forth below:

77.   On September 8, 2007, at 0550 **SENTER** observed **Thomas James Fredenburg** run head first into the cell wall and fall over the toilet landing on the floor.  **SENTER** entered the call [*sic*] and observed a contusion to **Thomas James Fredenburg**'s right elbow and buttocks. **SENTER** and two other deputies escorted **Thomas James Fredenburg** to the IRSC (padded cell), as documented in the Pasco County Incident Report dated 9-8-07 at 0605.

84.   On September 8, 2007 at 1245, **SENTER**, of the **SHERIFF**'s office, observed **Thomas James Fredenburg** throw himself head first onto the cell floor repeatedly landing near the steel grate.  **SENTER** informed **KANDALEC**, who advised **SENTER** to place **Thomas James Fredenburg** in the **prostraint chair "again"**!  **SENTER** and two other unknown deputies escorted **Thomas James Fredenburg** to be placed in the **prostraint chair**. Mental Health Worker Boggs and **SCHMIDT** were also notified, as documented in the Pasco County Jail Incident Report dated 9-8-07 at 1315.

85.   September 8, 2007, at 1245, **DAVIS** stated that when **SENTER** and **ROZANKOWSKI** went in to the IRSC they waited until **Thomas James Fredenburg** ran into the wall and fell on the floor before they took him into custody.  The deputies then escorted him to the **prostraint chair**, as documented in Det. Proctor's report dated 10-4-07, Page 2, Line 16.

86.   The actions of **DAVIS, SENTER and ROZANKOWSKI** clearly indicate they were deliberately indifferent to the rights of **Thomas James Fredenburg** in that he not be physically abused as a result of his arrest and incarcerated as a pre-trial inmate.

87.   On September 8, 2007, at 1715 hours, **SENTER** observed Mental Health Worker Boggs check on **Thomas James Fredenburg** in the **prostraint chair** and

24

Mental Health Worker Boggs attempt to interview him.  **SENTER** stated that **Thomas James Fredenburg** was making irrational statements and that Mental Health Worker Boggs decided to leave in the **prostraint chair**, as documented in Det. Proctor's dated 10-4-07, Page 4, Line 11.  The IRSC room is referred to as a padded cell when, in fact, there are no pads in the cell, it is merely an empty cell with a drain and a non-enclosed stainless steel toilet.

88.  On September 8, 2007, at 1752, **OJEDA**, employed by the **SHERIFF's** office, relieved **SENTER** in the medical wing, and, removed **Thomas James Fredenburg** from the **prostraint chair** and escorted him back to the IRSC, as documented in the Pasco County Jail Incident Report dated 9-8-07 at 2029 hours.

(Dkt. No. 30 ¶¶ 77, 84-88).  In his Motion to Dismiss, Defendant Senter argues that his limited actions described above "are insufficient to state a § 1983 claim." (Dkt. No. 38 at 10.)  According to Defendant Senter, "[t]hese limited actions . . . are not so grossly incompetent to shock the conscience, which is the required showing to hold him liable individually."  (*Id.*)

The Court finds that Plaintiff has alleged sufficient facts to establish potential liability under § 1983 for Defendant Senter.  As to the first prong, according to Plaintiff, Defendant Senter observed Mr. Fredenburg repeatedly running into the cell wall and throwing himself head first onto the cell floor.  Plaintiff also alleges that Defendant Senter observed a contusion on Mr. Fredenburg's right elbow and buttocks.  It is also alleged that Defendant Senter stated that Mr. Fredenburg was making irrational statements.  Thus, as alleged, a reasonable inference can be drawn that Defendant Senter had subjective knowledge of a risk of serious harm based upon Defendant Senter's observations of Mr. Fredenburg's alleged irrational behavior.  Plaintiff has also sufficiently alleged that Defendant Senter disregarded that risk by waiting until Mr. Fredenburg ran into the wall and fell on the floor before taking him into custody.  Finally, Plaintiff's allegations also sufficiently establish that Defendant Senter's actions may have been

more than mere or even gross negligence. Thus, Plaintiff has adequately alleged that Defendant Senter may have been deliberately indifferent to Mr. Fredenburg's serious medical need. Additionally, the Amended Complaint sufficiently alleges that these actions caused injuries and may have ultimately resulted in Mr. Fredenburg's death. Accordingly, the Court recommends that Defendant Senter's Motion to Dismiss (Dkt. No. 38) be **DENIED**.

### 5)      Defendant Deputy Ronald Davis

As alleged in Plaintiff's Amended Complaint, Defendant Deputy Ronald Davis "was, at all times pertinent hereto, a Deputy, Corrections Officer, or Detention Personnel employed by defendant **COUNTY** or defendant **SHERIFF** or taking direction therefrom." (Dkt. No. 30 ¶ 15.) The allegations against Defendant Davis are set forth below:

78. On September 8, 2007, at 0550 prior to **SENTER** entering the cell, **DAVIS** observed **Thomas James Fredenburg** run into the cell wall and fall on the floor on two different occasions. **DAVIS** observed **Thomas James Fredenburg** to have several small bruises all over his body and a softball size bruise on his hip, as documented in Det. Proctor's report dated 10-4-07, Page 4, Line 13.

81. On September 8, 2007, at approximately between 0555 and 1245, **DAVIS**, employed by the **SHERIFF**, stated that after **Thomas James Fredenburg** was placed in the IRSC he was doing O.K. for a few minutes. **DAVIS** stated **Thomas James Fredenburg** was still running into the wall, however they were not concerned about him because the walls were somewhat padded. **DAVIS** grew concerned when **Thomas James Fredenburg** started to throw himself on the floor near the steel drain area. At approximately noon **DAVIS** spoke to **KANDALEC**, a Supervisor of the detention department. **KANDALEC** advised **DAVIS** to place **Thomas James Fredenburg** in the **prostraint chair**, as documented in Det. Proctor's report dated 10-4-07, Page 2, Line 12.

82. At this point, **Thomas James Fredenburg** was delusional, exhibiting psychotic episodes, with catatonic-like behavior, as well as being disoriented and having trauma to the head and body was placed in a non-medical device called a

**prostraint chair**.  A **prostraint chair** is used to dissuade aggressive inmates from fighting either deputies or other inmates.  There is no medical reason, *given Thomas James Fredenburg's physical condition and state of mind*, for placing **Thomas James Fredenburg** in a **prostraint chair.  This was a punitive action and it violated his Constitutional rights**. To this point, no one from the **COUNTY**, no one from the **SHERIFF**'s office, no one from the **SHERIFF**'s detention department, and no one from the **SHERIFF**'s nursing department had any intention of providing **Thomas James Fredenburg** with proper medical care.  **Thomas James Fredenburg** should have been placed in care of a mental health institution or hospital with proper facilities to deal with his problem.

85.   September 8, 2007, at 1245, **DAVIS** stated that when **SENTER** and **ROZANKOWSKI** went in to the IRSC they waited until **Thomas James Fredenburg** <u>ran into the wall and fell on the floor before they took him into custody</u>.  The deputies then escorted him to the **prostraint chair**, as documented in Det. Proctor's report dated 10-4-07, Page 2, Line 16.

86.  The actions of **DAVIS, SENTER and ROZANKOWSKI** clearly indicate they were deliberately indifferent to the rights of **Thomas James Fredenburg** in that he not be physically abused as a result of his arrest and incarcerated as a <u>pre-trial inmate</u>.

(Dkt. No. 30 ¶¶ 78, 81-82, 85-86.)   Defendant Davis argues in his Motion to Dismiss that Plaintiff's allegations against him "that he saw Fredenburg running into the wall, saw some bruises on him, grew concerned and notified his Sergeant about these actions, which prompted Fredenburg to be placed in a prostraint chair, are insufficient to state a § 1983 claim" against Defendant Davis.  (Dkt. No. 39 at 9.)  The Court disagrees with Defendant Davis' contention.

First, in his Amended Complaint, Plaintiff states that Defendant Davis observed Mr. Fredenburg run into the cell wall on two occasions and that he observed several bruises all over Mr. Fredenburg's body.  Thus, as with Defendant Senter, the allegations about Defendant Davis' observations of Mr. Fredenburg are sufficient to establish a logical inference that Defendant Davis

had subjective knowledge of a risk of serious harm.  Second, Plaintiff alleges that Defendant Davis placed Mr. Fredenburg in a prostrait chair and that there was no medical reason, given Mr. Fredenburg's physical condition and state of mind, for such an action.  While it may be argued that Defendant Davis acted in accordance with Defendant Kandalec's instructions, at this stage when all factual allegations are taken in light most favorable to Plaintiff, the Court finds that Plaintiff has sufficiently alleged that Defendant Davis disregarded the risk of harm to Mr. Fredenburg.  Turning to the third prong, a fact finder could infer that Defendant Davis' conduct was more than merely negligent.  Although he allegedly noticed several bruises on Mr. Fredenburg's body and observed Mr. Fredenburg running into the cell wall and throwing himself on the floor near the steel drain area, Defendant Davis did not seek medical care.  Thus, the Amended Complaint sufficiently alleges that Defendant Davis may have been deliberately indifferent to Mr. Fredenburg's serious medical need.  The Amended Complaint also adequately alleges that Defendant Davis' alleged indifference caused injuries and may have ultimately resulted in Mr. Fredenburg's death.  Accordingly, the Court recommends that Defendant Davis' Motion to Dismiss (Dkt. No. 39) be **DENIED**.

### 6)     Defendant Deputy Shawn Rozankowski

As alleged in Plaintiff's Amended Complaint, Defendant Deputy Shawn Rozankowski "was, at all times pertinent hereto, a Deputy, Corrections Officer, or Detention Personnel employed by defendant **COUNTY** or defendant **SHERIFF** or taking direction therefrom." (Dkt. No. 30 ¶ 16.)  The allegations against Defendant Rozankowski are as follows:

> 85.   September 8, 2007, at 1245, **DAVIS** stated that when **SENTER** and **ROZANKOWSKI** went in to the IRSC they waited until **Thomas James**

28

**Fredenburg** <u>ran into the wall and fell on the floor before they took him into custody</u>.  The deputies then escorted him to the **prostraint chair**, as documented in Det. Proctor's report dated 10-4-07, Page 2, Line 16.

86.  The actions of **DAVIS, SENTER and ROZANKOWSKI** clearly indicate they were deliberately indifferent to the rights of **Thomas James Fredenburg** in that he not be physically abused as a result of his arrest and incarcerated as a <u>pre-trial inmate</u>.

(Dkt. No. 30 ¶¶ 85-86.)  In his Motion to Dismiss (Dkt. No. 40), Defendant Rozankowski argues that Plaintiff's allegations "that he and another officer waited until after Fredenburg ran into the wall and fell to the floor before taking him into custody to escort him to the prostraint chair, are insufficient to state a § 1983 claim" against him.  (Dkt. No. 40 at 9.)  The Court finds that Plaintiff has sufficiently stated a claim against Defendant Rozankowski for deliberate indifference to Mr. Fredenburg's serious medical need.

Looking to the first prong, Defendant Rozankowski, like Defendant Davis, knew that there was a risk of serious harm to Mr. Fredenburg because he had observed Mr. Fredenburg running into the wall and falling on the floor, and causing injury to himself.  The factual allegations as to Defendant Rozankowski also meet the second prong.  Instead of seeking medical care, Defendant Rozankowski allegedly took Mr. Fredenburg in custody and escorted him to a prostraint chair.  And, as noted previously, according to Plaintiff allegations, a prostraint chair "is used to dissuade aggressive inmates from fighting either deputies or other inmates" and there was no medical reason for placing Mr. Fredenburg in the prostraint chair.  (*See* Dkt. No. 30 ¶ 82.)  Thus, taking the facts alleged in light most favorable to Plaintiff, the Amended Complaint supports an inference that Defendant Rozankowski disregarded the risk by not seeking medical attention.  As

to the third prong, while it may be argued that Defendant Rozankowski's conduct was no more than merely negligent, taken in light most favorable to Plaintiff, a fact finder could infer that Defendant Rozankowski ignored Mr. Fredenburg's medical condition without explanation. *See Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2008) ("When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference.").

Thus, Plaintiff has adequately alleged that Defendant Rozankowski may have been deliberately indifferent to Mr. Fredenburg's serious medical need and that the indifference caused injuries and may have ultimately resulted in Mr. Fredenburg's death.  Accordingly, the Court recommends that Defendant Rozankowski's Motion to Dismiss (Dkt. No. 40) be **DENIED**.

### 7)      Defendant Deputy Pedro Ojeda

Plaintiff alleges that Defendant Deputy Pedro Ojeda "was, at all times pertinent hereto, a Deputy, Corrections Officer, or Detention Personnel employed by defendant **COUNTY** or defendant **SHERIFF**, or taking direction therefrom." (Dkt. No. 30 ¶ 17.)  Plaintiff's allegations against Defendant Ojeda state:

> 88.  On September 8, 2007, at 1752, **OJEDA**, employed by the **SHERIFF's** office, relieved **SENTER** in the medical wing, and, removed **Thomas James Fredenburg** from the **prostraint chair** and escorted him back to the IRSC, as documented in the Pasco County Jail Incident Report dated 9-8-07 at 2029 hours.

(Dkt. No. 30 ¶ 88.)  Defendant Ojeda asserts in his Motion to Dismiss (Dkt. No. 41) that these allegations "that he merely escorted Fredenburg, along with another officer, from the prostraint

chair to another cell, are insufficient to state a § 1983 claim against Deputy Ojeda." (Dkt. No. 41 at 9.) Thus, Defendant Ojeda claims that he "should be granted qualified immunity as there is no factual basis that he acted deliberately indifferent to the serious medical needs of Thomas James Fredenburg." (*Id*.) The Court agrees.

While Plaintiff has alleged an objective serious medical need, even with a liberal construction, Plaintiff's Amended Complaint does not allege sufficient facts to show that Defendant Ojeda was deliberately indifferent to that serious medical need. Specifically, Plaintiff alleges no facts showing that Defendant Ojeda had subjective knowledge of a risk of serious harm. Further, subjective knowledge cannot be inferred from the allegations because they are devoid of any facts alleging that Defendant Ojeda personally observed any symptoms indicative of Mr. Fredenburg's medical condition. The allegations that other deputies may have observed Mr. Fredenburg's irrational behavior and physical injuries are insufficient to demonstrate that Deputy Ojeda was subjectively aware of the serious medical need. *See Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (internal citations omitted) ("[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . . Each individual Defendant must be judged separately and on the basis of what that person knows."). Given this deficiency, Plaintiff's Amended Complaint does not allege a plausible claim that Defendant Ojeda in particular was deliberately indifferent to Mr. Fredenburg's serious medical need. Accordingly, Defendant Ojeda is entitled to qualified immunity and the Court recommends that his Motion to Dismiss (Dkt. No. 41) be **GRANTED**.

31

### 8)     Defendant Cindy Bell, LPN

Plaintiff alleges that Defendant Cindy Bell, LPN "was, at all times pertinent hereto, an

LPN employed by defendant **COUNTY** or defendant **SHERIFF**, or taking direction there from."

(Dkt. No. 30 ¶ 22.)  The allegations against Defendant Bell are contained in one paragraph and

state:

> 50.  August 30, 2007 (Thursday) at 0515 **GREEN** observed **Thomas James Fredenburg** rocking back and forth in the cell and notified **BELL.  BELL** approved **Thomas James Fredenburg** be moved to a medical cell, as documented in the Pasco County Jail Incident Report dated 89-30-07 at 0530. The medical cell in question was a single person cell with concrete walls and no padding.  Between August 24, 2007 at 0900 and August 30, 2007 at 0515, **Thomas James Fredenburg** had received no medication or medical treatment and, in fact, the detention deputies and nurses completely ignored his presence and medical needs for a minimum of three and a half days.

(Dkt. No. 30 ¶ 50.)  Defendant Bell argues in her Motion to Dismiss (Dkt. No. 42) that Plaintiff's

allegations "that she was notified by an officer that Fredenburg was rocking back and forth in his

cell, and in response she approved that he be moved to a medical cell, are insufficient to state a

§ 1983 claim" against her.  (Dkt. No. 42 at 9.)

Based upon Plaintiff's allegations, it is clear that Defendant Bell's subjective knowledge

of a risk of serious harm may be inferred from the allegations that she was notified that Mr.

Fredenburg was rocking back and forth in the cell, and that she approved Mr. Fredenburg's

transfer to a *medical cell*.  (*See* Dkt. No. 30 ¶ 50) (emphasis added).  However, the questions

based upon the allegations as to whether Defendant Bell disregarded that risk, and whether

Defendant Bell's conduct was more than mere negligence are not as clear.  Arguably, Plaintiff's

allegations could demonstrate that Defendant Bell did not disregard Mr. Fredenburg's serious

32

medical need because Defendant Bell responded to Mr. Fredenburg's actions of rocking back and forth by having him transferred to a medical cell.  Further, even if one were to infer that Defendant Bell's transfer of Mr. Fredenburg to a medical cell was a failure on Defendant Bell's part to disregard the risk, it can be argued that the allegations, even liberally construed, do not allege conduct that is more than mere negligence. *See Brown*, 387 F.3d at 1351 (stating that deliberate indifference requires that a defendant disregards a risk of serious harm by conduct that exceeds mere negligence).  However, Plaintiff's overriding allegation is Defendant Bell failed to seek appropriate medical care for Mr. Fredenburg, and given that the issue of whether Defendant Bell disregarded the risk of serious harm by conduct that is more than mere negligence is an issue of fact, the Court finds that Plaintiff has sufficiently alleged a plausible claim against Defendant Bell.

Accordingly, the Court finds that Plaintiff has sufficiently alleged that Defendant Bell was deliberately indifferent to Mr. Fredenburg's serious medical need and therefore, the Court recommends that Defendant Bell's Motion to Dismiss (Dkt. No. 42) be **DENIED**.

### 9)       Defendant Elizabeth Kenjorski, LPN

Plaintiff alleges that Defendant Elizabeth Kenjorski, LPN "was, at all times pertinent hereto, an LPN employed by defendant **COUNTY** or defendant **SHERIFF**, or taking direction there from." (Dkt. No. 30 ¶ 23.)  The allegations against Defendant Kenjorski are contained in one paragraph and state:

> 52.  On August 30, 2007 at 1300 **KENJORSKI** observed Thomas James **Fredenburg** yelling at his cell door, observed his pupils to be dilated and he appeared to be very agitated.  **KENJORSKI** wrote in her notes, "per S/O start

33

D.T. protocol (with Librium)", as documented in nursing notes, Page 2, Line 12. **NOTE: Thomas James Fredenburg was never prescribed the Librium as indicated.**

(Dkt. No. 30 ¶ 52.)  In her Motion to Dismiss (Dkt. No. 43), Defendant Kenjorski argues that the allegations "that she observed Fredenburg on August 30, 2007, to be yelling at his cell door, to have dilated pupils and be agitated, and that she made a notation in the nursing notes to start detox protocol, are insufficient to state a § 1983 claim against" her.  (Dkt. No. 43 at 9.)

The Court finds that the facts, as claimed, support an inference that Defendant Kenjorski was subjectively aware of a risk of serious harm based upon her observations of Mr. Fredenburg's conduct, as well as her course of action in recommending the detox protocol.  Nonetheless, as with Defendant Bell, one could argue that Plaintiff cannot demonstrate that Defendant Kenjorski disregarded the risk of harm by more than merely negligent conduct because she prescribed a detox protocol with Librium.  However, as the Court concluded with Defendant Bell, whether Defendant Kenjorski disregarded the risk of harm by grossly negligent conduct is a question of fact.  Thus, the Court is satisfied that Plaintiff has sufficiently alleged a plausible claim against Defendant Kenjorski.  Accordingly, the Court recommends that Defendant Kenjorski's Motion to Dismiss (Dkt. No. 43) be **DENIED**.

### 10)     Defendant M.H. Perez, LPN

Plaintiff alleges that Defendant M.H. Perez, LPN "was, at all times pertinent hereto, an LPN employed by defendant **COUNTY** or defendant **SHERIFF**, or taking direction there from." (Dkt. No. 30 ¶ 25.)  The facts alleged against Defendant Perez are as follows:

34

74.  September 8, 2007 (Saturday) at 0200, Deputy Halstead heard a thump and a whimper coming from **Thomas James Fredenburg[ ]'s** cell. At that time, **Thomas James Fredenburg** was assigned to a medical cell, a single person cell with concrete walls and no padding.  Deputy Halstead observed **Thomas James Fredenburg** lying on his side and crying, Deputy Halstead called the nurse and **PEREZ**, employed by the **SHERIFF**, responded and examined **Thomas James Fredenburg**.  Deputy Halstead discussed with **PEREZ** whether **Thomas James Fredenburg** should be moved to a soft room or the restraint chair.  PEREZ replied that **Thomas James Fredenburg** did not meet the criteria, as documented in Det. Proctor's report dated 10-04-07, Page 6, Line 3.  Approximately 10-15 minutes later, Deputy Halstead heard another thump, proceeded to **Thomas James Fredenburg's** cell and saw **Thomas James Fredenburg** sitting on his butt with his knees up and crying. Halstead called **PEREZ** again and was told **Thomas James Fredenburg still did not meet the criteria**, as documented in Det. Proctor's report dated 10-04-07, Page 6, Line 4.

75.  On September 8, 2007, at 0225[ ], **PEREZ**, employed by the **SHERIFF**, responded to Deputy Halstead's request for assistance and observed **Thomas James Fredenburg** on the ground rolling around, hitting the floor.  She observed a large bruise to **Thomas James Fredenburg[']s** left hip that appeared to be purple in color.  **Thomas James Fredenburg** was uncooperative during the examination, as documented in the nursing notes Page 6, Line 18.

(Dkt. No. 30 ¶¶ 74-75.)  In her Motion to Dismiss (Dkt. No. 44), Defendant Perez argues that "Plaintiff's allegations . . . that she examined Fredenburg twice in the medical cell on September 8, 2007, that she felt he did not need to be transferred to a padded cell or restraint chair, that she observed a bruise on his hip and observed him to be uncooperative, are insufficient to state a § 1983 claim" against her.  (Dkt. No. 44 at 9.)  After reviewing the allegations in light most favorable to Plaintiff, the Court concludes that Plaintiff has alleged sufficient facts to establish potential liability under § 1983 for Defendant Perez.

As to the first prong, Plaintiff has alleged that Defendant Perez initially refused to transfer Mr. Fredenburg to a soft room or the restraint chair, and that approximately 25 minutes later, she

"responded to Deputy Halstead's request for assistance" (Dkt. No. 30 ¶ 75), and examined Mr.

Fredenburg two days before he died.  Further, Plaintiff alleged that Defendant Perez observed Mr.

Fredenburg rolling around, hitting the floor, and observed a large bruise on Mr. Fredenburg's left

hip that appeared to be purple in color.  Thus, Plaintiff has sufficiently alleged that Defendant

Perez had subjective knowledge of a risk of serious harm.  Plaintiff has also sufficiently alleged

that Defendant Perez disregarded that risk based upon Inmate Morgan's alleged observations that

Defendant Perez "did not really seem to care about what happened" to Mr. Fredenburg. (*Id.* ¶ 75)

Finally, in consideration of Plaintiff's allegations regarding Defendant Perez's observations of

Mr. Fredenburg's physical injuries and state of mind on September 8, 2007, the Court also

concludes that Defendant Perez's actions may have been more than mere or even gross

negligence.  Thus, Plaintiff has adequately alleged that Defendant Perez may have been

deliberately indifferent to Mr. Fredenburg's serious medical need.  Accordingly, the Court

recommends that Defendant Perez's Motion to Dismiss (Dkt. No. 44) be **DENIED**.

### 11)     Defendant Julie Meritt, LPN

Plaintiff alleges that Defendant Julie Meritt, LPN "was, at all times pertinent hereto, an

LPN employed by defendant **COUNTY** or defendant **SHERIFF**, or taking direction there from."

(Dkt. No. 30 ¶ 26.)  The only allegation against Defendant Meritt is contained in Paragraph 79

of the Complaint and states:

> 79.  On September 8, 2007 at approximately 0930, Mental Health Worker Boggs
> observed **Thomas James Fredenburg**, in the IRSC, to be disoriented, confused,
> with unintelligible sounds, disconnected thoughts and catatonic like behavior.
> Boggs also placed a telephone call to Dr. Hanna, as documented in the Mental
> Health Report date 9-8-07.  At 0930, **MERRITT**, employed by the **SHERIFF**,
> received a telephone call from Dr. Hanna who approved placing Thomas James

36

> **Fredenburg** in the IRSC and ordered additional medications (Trilafon and Ativan) for **Thomas James Fredenburg**[], as documented in the nursing notes Page 8, Line 7.

(Dkt. No. 30 ¶ 79.)  Defendant Merritt states in support of her Motion to Dismiss (Dkt. No. 45) that "Plaintiff's allegations against Julie Merritt that she simply took a phone call from Dr. Hanna on September 8, 2007, are insufficient to state a § 1983 claim" against her.  (Dkt. No. 45 at 9.) The Court agrees.  Plaintiff has not alleged that Defendant Merritt had any knowledge of a risk of serious harm and that she disregarded that risk by conduct that is more than mere negligence. Accordingly, the Court finds that Defendant Meritt is entitled to qualified immunity, and therefore the Court recommends that Defendant Merritt's Motion to Dismiss (Dkt. No. 45) be **GRANTED**.

### B.      Decedent's Pain and Suffering and Loss of Life Damages

Defendants also seek dismissal of the damages for the loss of life and mental and physical pain and suffering of the decedent on the basis that state law governs the § 1983 damages claims and in Florida these types of damages are not recoverable.  Plaintiff responds that Defendants' argument appears "to be premature in a motion to dismiss" because Defendants "do not claim that these counts fail to state a cause of action."  (Dkt. No. 69 at 9.)  Additionally, Plaintiff contends that it may plead alternative claims under state and federal law.  (*Id*.)

As an initial matter, whether Plaintiff may recover pain and suffering and loss of life damages under § 1983 is a question of law, properly resolved on a motion to dismiss.  *See, e.g.*, *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 598 (6th Cir. 2006) ("The question of whether [decedent's] estate is entitled to damages based on her loss of enjoyment of life is a legal one."). Accordingly, the Court will proceed to consider whether these types of damages are recoverable.

Section 1983 does not address appropriate remedies for civil rights violations.  *See Frontier*, 598 F.3d at 598.  However, 42 U.S.C. § 1988 authorizes courts to look to the common law of the States, if a civil rights statute is "deficient in the provisions necessary to furnish suitable remedies."  *See Gilmere v. City of Atlanta*, 864 F.2d 734, 738 (11th Cir. 1989) ("Federal courts are to turn to state law in order to fill gaps which may exist in federal law.").  Thus, where no federal rule exists, courts "apply the most appropriate damages rule of the forum state, unless that rule conflicts with the purposes behind section 1988."  *Finch v. City of Vernon*, 877 F.2d 1497, 1503 (11th Cir. 1989).  "If the applicable forum state rule does conflict with the purposes behind section 1988, federal courts must develop and apply a federal common law rule of damages."  *Id*.  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (*citing Carey v. Piphus*, 435 U.S. 247, 254-57 (1978)).

Under Florida law, damages for a decedent's pain and suffering or loss of life are not recoverable.  *See Martin v. United Sec. Servs., Inc.*, 314 So. 2d 765 (Fla. 1975); *Knowles v. Beverly Enterprises-Florida, Inc.*, 898 So. 2d 1, 9 (Fla. 2004) (stating that damages under the Florida Wrongful Death Act "are limited to the survivor's loss of support and services, companionship, and his or her own pain and suffering" and that "[t]he estate may also recover loss of earnings of the deceased and medical and funeral expenses").  Thus, the issue in this case

38

is whether application of Florida's Wrongful Death Act,[8] which is a bar to a decedent's pain and suffering and loss of life damages, conflicts with the purpose behind the Civil Rights Act.

The Court finds that under the facts of this case, an award of damages under Florida's Wrongful Death Act is not inconsistent with the intent of § 1983. The Florida statute provides compensatory damages for the survivors, including the value of lost support and services of the decedent, loss of the decedent's companionship and protection, and the survivors' mental pain and suffering. *See Florida Clarklift, Inc. v. Reutimann*, 323 So. 2d 640, 642 (Fla. Dist. Ct. App. 1975) ("The philosophy of the Act is to afford recovery for this element of damage for the living rather than the dead."). Additionally, Mr. Fredenburg's estate may recover his loss of earnings from the date of injury to the date of death and medical or funeral expenses due to the injury or death. Thus, Mr. Fredenburg's survivors and his estate will be adequately compensated under the Florida statute for the injuries suffered as a result of the alleged constitutional violation. *See Gilmere*, 864 F.2d at 739 ("The focus of any award of damages under § 1983 is to compensate for the actual injuries caused by the particular constitutional violation."). Lastly, the deterrent purpose of Section 1983 is satisfied by the fact that the Florida Wrongful Death Act allows for

---

[8] Florida's Wrongful Death Act allows each survivor to recover the value of lost support and services as well as future loss of support and services of decedent. Fla. Stat. § 768.21. The surviving spouse "may also recover the loss of the decedent's companionship and protection and for mental pain and suffering from the date of injury" and minor children "may also recover for lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury. *Id*. Additionally, "[m]edical or funeral expenses due to the decedent's injury or death may be recovered by a survivor who has paid them." Finally, the decedent's personal representative may recover for the decedent's estate the decedent's loss of earnings from the date of injury to the date of death and the medical or funeral expenses due to the decedent's injury or death that have become a charge against her or his estate. *See id*.

the recovery of punitive damages.  *See Florida Clarklift, Inc.*, 323 So. 2d at 642 ("upon proper allegations and proof of actual damages, punitive damages are recoverable under [the Florida Wrongful Death Act]").

Accordingly, the Court finds that Plaintiff's claims for pain and suffering and loss of life damages are precluded by Florida's Wrongful Death Act and the Court recommends that these damage requests be stricken from Counts I, II, and III of the Amended Complaint.[9]

### 2.      Defendant Pasco County's Motion to Dismiss

Defendant Pasco County (the "County") seeks dismissal of the claims for damages for Mr. Fredenburg's physical and mental pain and suffering and loss of enjoyment of life asserted against the County in Count I of the Amended Complaint.  Additionally, the County seeks dismissal of Count IV which asserts a claim for negligence resulting in wrongful death against the County, and Count V which asserts a claim for negligence resulting in pain and suffering of Mr. Fredenburg.

As discussed above, damages for a decedent's pain and suffering and loss of enjoyment of life are not recoverable under Florida's Wrongful Death Statute, codified at sections 768.16-.26, Florida Statutes.  Accordingly, the Court recommends that the County's Motion to Dismiss

---

[9]  In his Motion to Dismiss (Dkt. No. 46), Defendant Pasco Sheriff White requests that this Court strike the damages claims for severe physical and mental pain and suffering and the loss of enjoyment of life by Mr. Fredenburg from Counts VI and VII.  However, the claims for damages in both of these Counts are limited to those damages allowed under Florida law, such as "damages for the past and future loss of support and services, past and future lost parental companionship, instruction and guidance and the past and future mental pain and suffering of **Thomas James Fredenburg's** minor children . . . ."  (*See* Dkt. No. 30 at 40, 43.) Accordingly, the Court recommends denial of the Sheriff's Motion to Dismiss to the extent that it seeks dismissal of the damages claims in Counts VI and VII.

as it relates to the claims for damages for the physical and mental pain and suffering and loss of enjoyment of life be **GRANTED**.

Count IV of the Amended Complaint alleges that the County is liable for the negligent acts of the correction officers, including the Sheriff, and health care providers employed by the Sheriff's office, who, Plaintiff alleges, "were acting as agents, servants or apparent agents of the **COUNTY** while **Thomas James Fredenburg** was incarcerated." (Dkt. No. 30 ¶ 126.) Count V of the Complaint alleges that the County is liable for the pain and suffering of Mr. Fredenburg caused by the negligent acts of the corrections officers, including the Sheriff, and health care personnel, "who were acting as the agents, servants, or apparent agents of the **COUNTY** while **Thomas James Fredenburg** was incarcerated." (*Id.* ¶ 130.)

In its Motion to Dismiss (Dkt. No. 47), the County argues that Plaintiff did not allege facts establishing that the Sheriff and the correctional and medical staff Defendants were acting as the agents, servants, or apparent agents of the County or facts demonstrating the existence of an agency or employment relationship. Further, the County argues that the Sheriff and the correctional and medical staff Defendants are not, as a matter of Florida law, agents or servants of Pasco County, and that counties are not liable for negligent acts committed by sheriffs in the operation of county jails.

## A.   The Correctional and Medical Defendants as Officers, Employees, or Agents of the County

The County argues that it cannot be held vicariously liable for the actions of the Sheriff and the employees of the Pasco County Sheriff's Office, "given that sheriffs in Florida are

separate county constitutional officers over whom counties cannot exercise control including the hiring or firing of persons he designates or employs such as the Correctional and Medical Staff Defendants." (Dkt. No. 47 ¶ 12.)  In support, the County relies on Article 8 § 1(d)[10] of the Florida Constitution which provides for the election of a sheriff by the electors of each county, as well as several Florida statutes giving county sheriffs the power to hire and fire personnel, and to appoint deputies, and making the sheriffs responsible for the deputies' neglect and default.  The issue as framed by the County is not a novel one to this Court.  The question to be determined is the identity of "those officials or governmental bodies who speak with final policymaking authority for the local government actor concerning the action alleged to have caused a particular constitutional or statutory violation at issue."  *See Turquitt v. Jefferson County, Ala.*, 137 F.3d 1285, 1287 (11th Cir. 1998) (citing *McMillian v. Monroe County, Ala.*, 520 U.S. 781 (1997)).

The County suggests that the Sheriff is the final policymaking authority over the day to day operations of the jail.  However, I am inclined to agree with the Honorable Gregory A. Presnell, in that "[ e]ven under the most charitable reading, these statutes in no way suggest that county sheriffs are legally independent of the counties they serve, or that counties are *per se* immune from liability for the misdeeds of deputy sheriffs."  *Retalic v. Eslinger, et al.*, No. 6:07-cv-1268-Orl-31DAB, 2007 WL 2757378, at *1 (M.D. Fla. Sept. 20, 2007); *but see Jones v. Lamberti, et al.*, No. 07-60839-Civ, 2008 WL 4070293 (S.D. Fla. Aug. 28, 2008) (holding that the Sheriff is the final policy maker for the operation of the jail and that the County cannot be liable under §

---

[10]  Specifically, Art. 8 § 1(d) states in part: "County officers.  There shall be elected by the electors of each county, for terms of four years, a sheriff, a tax collector, a property appraiser, a supervisor of elections, and a clerk of the circuit court. . . ."

1983).   Moreover, "Art. 8 § 1(d) of the Florida Constitution establishes the sheriff as a 'county officer,' along with the property appraiser and tax collector, among others." *Id.*  Accordingly, this Court finds that the Sheriff and the correctional and medical staff Defendants are not separate county constitutional officers, but rather may be considered employees, officers, or agents of the County.

**B.      The County's Liability for the Correctional and Medical Defendants' Conduct**

The liability of governmental entities for acts committed by their employees is governed by Florida Statute § 768.28.  Pursuant to that statute,

> the state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity for liability for torts, but only to the extent specified in this act.  Actions at law against the state or any of its agencies or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions for injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this act.

Fla. Stat. § 768.28(1).  Thus, under this statute, governmental liability extends to the state, as well as its subdivisions, such as counties.

The County argues that it cannot be liable for any negligent acts committed by the Sheriff or his staff because Plaintiff has alleged that the Sheriff "was responsible for the day to day operations and implementation of policies and procedures at the Pasco County Jail."  (*See* Dkt. No. 47 at 7.) The County cites to a case, *Baugher v. Alachua County*, 305 So. 2d 838 (Fla. Dist.

43

Ct. App. 1975), for the proposition that the duty of a county "to construct and provide funds for the operation of the jail can hardly be the basis for holding that it thereby becomes responsible for the day-to-day detailed operation of the jail, including the designation of which prisoners are to be placed in particular cells within the jail." (Dkt. No. 47 at 7 (*citing Baugher*, 305 So. 3d at 839).) The Court is not persuaded by the County's arguments. In *Baugher*, a wrongful death case in which one prisoner was murdered by another jail inmate, there was no allegation that a county policy caused the murder. Instead, the allegation was that the county was liable because it was ultimately responsible for the operation of the jail. The *Baugher* court did not hold that a county cannot be held liable for the negligent acts of a sheriff committed while operating the jail. Rather, the court held that a county's ownership of a jail, alone, does not make it responsible for every decision made by those operating it. That decision does not aid Pasco County here, as its liability would be based on its own alleged policies, not mere ownership of the jail.

For example, Plaintiff alleges the County was "the entity responsible, through its Board of County Commissioners, for the operation of county government, including the Pasco County Jail," through the Sheriff, and that the Sheriff and Sheriff's Office "were responsible for the day to day operations and implementation of policies and procedures at the Pasco County Jail." (Dkt. No. 30 ¶ 7.) Additionally, Plaintiff alleges that the Sheriff "had a duty to perform the function of operating the Pasco County Jail under a relationship with Pasco County and the State of Florida." (*Id*. ¶ 8.) Plaintiff also alleges that "[t]he **Defendants COUNTY** and **SHERIFF** failed to have a custom and/or policy to insure the rights of **Thomas James Fredenburg** under the United States Constitutional [*sic*] and the Constitutional [*sic*] of the State of Florida were not violated." (*Id*. ¶ 83.)

Plaintiff further alleges that "[a]s a direct and proximate result of the conduct of Defendant **COUNTY** and its employees, servants and agents . . . **Thomas James Fredenburg** died on September 10, 2007." (Dkt. No. 30 at 34.)   In addition, Plaintiff avers that the "**COUNTY** was negligent in the care and treatment rendered to **Thomas James Fredenburg**, and that **COUNTY** . . . failed to provide a level of care, skill and treatment which, in light of the surrounding circumstances is recognized as acceptable and appropriate by reasonable prudent similar detention facilities." (*Id*. at 37.)

Accepting these factual allegations as true and taking them in the light most favorable to Plaintiff, the Court concludes that they sufficiently establish the County's liability based on its own policies and the Sheriff's lawfully vested power. *See McGhee v. Volusia County*, 679 So. 2d 729, 732 (Fla. 1996) (reversing dismissal of the action against the county, finding that "[t]he officer's misconduct, though illegal, clearly was accomplished through an abuse of power lawfully vested in the officer, not an unlawful usurpation of power the officer did not rightfully possess."). Accordingly, the Court recommends that the County's Motion to Dismiss be **GRANTED IN PART** as to the issues of damages and **DENIED IN PART** as to the remaining issues.

### **Conclusion**

For the foregoing reasons it is **RECOMMENDED** that:

1) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Lt. Thomas Perron** (Dkt. No. 35) be **GRANTED**;

2) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Sgt. Donald Kandalec** (Dkt. No. 36) be **GRANTED IN PART** as the issue of damages and **DENIED IN PART** as to the remaining issues;

3) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Sgt. James Rollston** (Dkt. No. 37) be **GRANTED**;

4) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Deputy Michael Senter** (Dkt. No. 38) be **GRANTED IN PART** as the issue of damages and **DENIED IN PART** as to the remaining issues;

5) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Deputy Ronald Davis** (Dkt. No. 39) be **GRANTED IN PART** as the issue of damages and **DENIED IN PART** as to the remaining issues;

6) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Deputy Shawn Rozankowski** (Dkt. No. 40) be **GRANTED IN PART** as the issue of damages and **DENIED IN PART** as to the remaining issues;

7) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Deputy Pedro Ojeda** (Dkt. No. 41) be **GRANTED**;

8) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Cindy Bell, LPN** (Dkt. No. 42) be **GRANTED IN PART** as the issue of damages and **DENIED IN PART** as to the remaining issues;

9) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Elizabeth Kenjorski, LPN** (Dkt. No. 43) be **GRANTED IN PART** as the issue of damages and **DENIED IN PART** as to the remaining issues;

10) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant M.H. Perez, LPN** (Dkt. No. 44) be **GRANTED IN PART** as the issue of damages and **DENIED IN PART** as to the remaining issues;

11) **Motion to Dismiss Plaintiff's First Amended Complaint by Defendant Julie Merritt, LPN** (Dkt. No. 45) be **GRANTED**;

12) **Motion to Dismiss by Defendant Pasco Sheriff White** (Dkt. No. 46) be **GRANTED IN PART** as to the damages claims in Count II of the Amended Complaint and **DENIED IN PART** as to the damages claims in Counts VI and VII of the Amended Complaint; and

13) **Defendant's Pasco County, Motion to Dismiss Count I, IV and V of Plaintiff's First Amended Complaint** (Dkt. No. 47) be **GRANTED IN PART** as the issue of damages in Count I of the Amended Complaint and **DENIED IN PART** as to the remaining issues.

**IT IS SO REPORTED** at Tampa, Florida, this 30th day of September, 2010.

ANTHONY E. PORCELLI
United States Magistrate Judge

47

**NOTICE TO PARTIES**

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a *de novo* determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(c); Local Rule 6.02; *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir. 1982) (en banc).

Copies furnished to:

Honorable Virginia M. Hernandez Covington

Counsel of Record